# EXHIBIT B

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit
https://www.djreprints.com.

https://www.wsj.com/articles/financier-who-amassed-insurance-firms-diverted-2-billion-into-his-private-empire-11551367856

MARKETS

# Financier Who Amassed Insurance Firms Diverted $2 Billion Into His Private Empire

**The sheer scale of Greg Lindberg's efforts has little precedent in recent decades, industry experts say**

*By Mark Maremont and* [*Leslie Scism*](#)
Updated Feb. 28, 2019 9:48 pm ET

Soon after Greg Lindberg moved into the insurance business, the North Carolina entrepreneur went on a spending spree.

He bought nearly 100 companies around the globe, an estate in the Florida Keys, an Idaho lakeside retreat, a Gulfstream jet and the most expensive mansion ever sold in Raleigh, N.C. In September 2018 he added a 214-foot yacht with room for a dozen overnight guests. He also became the largest political donor in North Carolina and lavished money on other races around the country.

The cash came, at least in part, from huge sums Mr. Lindberg diverted from the group of life insurance firms he began assembling in 2014, a Wall Street Journal investigation found.

The Yale-educated executive lent at least $2 billion from those insurers to scores of entities he controlled, using much of it to expand his private holdings, according to interviews, regulatory filings and more than 4,500 internal documents from Mr. Lindberg's companies reviewed by the Journal.

The sheer scale of Mr. Lindberg's use of insurance assets to invest in his own businesses has little precedent in recent decades, industry experts say, and exposes hundreds of thousands of policyholders to an unusual and potentially risky strategy.

The insurers disguised the money flow by contending in public regulatory filings that many of the entities they invested in, with names such as Secured Loan-Backed Funding IV LLC, weren't affiliated with his empire. In reality, documents show, that entity and more than 100 similar ones were set up by Mr. Lindberg to direct money to his own ventures, the Journal found.



Greg Lindberg

**PHOTO:** GREG LINDBERG/ROBERT BROWN PUBLIC RELATIONS/ASSOCIATED PRESS

Mr. Lindberg is among a wave of financiers who have snapped up life-insurance companies in recent years, contending they can do better than traditional owners in investing the vast assets on insurers' books in a low interest-rate environment. Some in this new class of owners have deployed unusual financial structures and complex investments, challenging state regulators who have struggled to stay on top of the changing environment.

In Mr. Lindberg's case, his empire-building has drawn scrutiny from both federal and state authorities.

A federal criminal investigation, made public in October after subpoenas were issued, is looking into Mr. Lindberg's political donations and his relationship with North Carolina regulators, according to people familiar with the matter. North Carolina is one of 11 states in which insurance commissioners are elected. The probe also is exploring potential financial misdeeds related to the insurers, according to people familiar with the matter.

The federal investigation includes secret recordings made by North Carolina's current insurance commissioner, who took office in January 2017 and began cooperating with the Federal Bureau of Investigation in the first half of 2018, according to people with knowledge of parts of the probe.

Meanwhile, North Carolina insurance regulators are sorting through the complicated debt and equity structures set up by Mr. Lindberg to figure out where the money went and whether the insurers have losses, according to people with direct knowledge of the matter. Vermont also is investigating the Lindberg-related dealings of an insurer based there, a Vermont regulator said.



One of Greg Lindberg's Gulfstream jets.

**PHOTO:** GRAHAM REEVE

Mr. Lindberg declined interview requests. A spokesman said in a series of written responses that Mr. Lindberg is cooperating with the federal investigation and with state regulators, and is "aggressively working" to reduce the level of related-party loans. He declined to answer questions about Mr. Lindberg's political donations.

The spokesman pegged the volume of investments by Mr. Lindberg's insurers in entities in which he has a "significant economic interest" at $2 billion. He said the investment strategy was approved in advance by North Carolina regulators and was part of a plan by Mr. Lindberg to both improve investment returns for his insurers and expand his overall enterprise.

The spokesman said the U.S. insurers have large financial cushions, hold substantial cash and other liquid assets, and "to this point, there has never been a payment default" on the loans to Lindberg entities. When loans to unrelated borrowers soured, he said, Mr. Lindberg reimbursed his insurers for tens of millions of dollars in losses.

Life insurers, the type run by Mr. Lindberg, normally are very staid enterprises. They are paid premiums up front by policyholders and typically invest the money conservatively for years so they have enough to pay claims. Most invest premium funds in high-quality bonds. Many also own real estate and other less-liquid holdings.

**Homeowner Policy**

Greg Lindberg used insurance-company money to fund the 2018 purchase of a mansion in Raleigh, N.C.

**Greg Lindberg**

owns →

**Colorado Bankers Life Insurance**

invested $40 million in...

president of →

**Kite Asset Management**

loaned $3.3 million to...

controls →

**Morning Mountain Holdings**

made $5.5 million purchase of...



**Mansion in Raleigh, N.C.**

Sources: insurer regulatory filings; N.C. and Delaware corporate filings; county property records

Insurance-company owners are permitted to invest some of the premium money in their own ventures, but regulators monitor these transactions closely to be sure the investments are safe and are fair deals for the insurers. One concern is that related-party investments often aren't publicly traded and can be difficult to value and sell.

Some states explicitly limit such "affiliated investments" to 10% of total assets, to protect policyholders.

Mr. Lindberg's investment of insurance funds into affiliates at one point amounted to more than 50% of the assets of one of his main insurers, according to regulatory filings and other documents.

"Insurance-company assets are not intended to be a piggy bank for your other activities," said Therese Vaughan, a former Iowa insurance commissioner who is now a Drake University insurance and actuarial science professor, speaking generally.

Now 48 years old, Mr. Lindberg began a health-insurance newsletter from his Yale dorm room. He eventually built a conglomerate based in Durham, N.C., that consisted of separate entities tied together with the brand name Eli Global. Before the insurance binge, Eli Global had annual revenue of about $150 million, according to internal corporate documents, and included a medical-coding company, collection agencies and a sports-memorabilia firm.

Mr. Lindberg owns 100% of Eli Global and his insurance empire.

Former employees recall Mr. Lindberg as a financially brilliant, hands-on owner. Mr. Lindberg gave considerable rein to his top executives, but would often personally approve even the smallest expenses at new acquisitions.

"It was a fun place to work" because it was informal and entrepreneurial, said Ian Lipman, a former Eli Global mergers specialist.

Mr. Lindberg also could be socially awkward and quirky, according to some former employees and people who have dealt with him on business matters. For years he wore only black pants and black T-shirts to work, and typically ate from bags of fruit and nuts. He gobbled vitamins and supplements and for exercise ran at high speed on a treadmill set at maximum incline for more than an hour, former employees say.

"Mr. Lindberg is health conscious and focuses on other variables in his life beyond what he wears," his spokesman said.

He could be frugal. He wrote last year in a personal blog post of buying folding tables and chairs in the early days of his company, which he later replaced with "hideous" but more comfortable secondhand furniture. Eli Global shifted thousands of jobs to India to save money, then provided a bicycle—rather than a car—when Indian IT staffers visited Durham, former employees recall.



Mr. Lindberg has put this Florida Keys estate up for sale, along with other holdings.

**PHOTO:** NICK DOLL PHOTOGRAPHY



Inside the house on Shark Key, on the outskirts of Key West, Fla.

**PHOTO:** NICK DOLL PHOTOGRAPHY

Mr. Lindberg began scouring insurers for possible acquisitions in about 2012. What most
seemed to attract him, former employees say, was the large cache of assets on insurers'
balance sheets.

Initially, he looked for small insurers that wouldn't cost much, according to a deposition
in later litigation over banking fees. His purchases eventually included a Louisiana
insurer bought out of receivership and a struggling Dutch insurer acquired for €1.

Mr. Lindberg told regulators that investing in his own businesses was a safe strategy for
the insurers because his company had achieved 35% annual investment returns. "Eli
Global has a long history in establishing private placements and managing the risks
successfully," the company said in one presentation to regulators.

His first acquisition, in 2014, was a small Alabama burial-policy insurer, Southland
National Insurance Corp. It had about $170 million of assets to cover future claims as
policyholders died. Mr. Lindberg paid about $22 million for it.

He was candid about wanting a bigger role for affiliated investments in seeking deal
approval from Alabama regulators. At a hearing, he said he thought Southland could do
better by swapping some low-yielding corporate bonds into floating-rate debt of his Eli
Global operating companies.

Alabama had a law that explicitly limited such investments to the lesser of 10% of total
assets or an amount less than half the insurer's net worth. Mr. Lindberg assured Alabama

regulators he would keep affiliated investments within the limits, which would have restricted such deals to just a few million dollars because of the insurer's low net worth.

Unlike other areas of finance, insurers are regulated primarily by states, not a single federal agency. Although a national standards-setting body accredits insurance departments, states retain flexibility. As a result, companies can shop around for an accommodating venue.

## Private Push

Privately placed bonds played a bigger role in the investment portfolios of two of Greg Lindberg's four U.S. life insurers as they invested in his businesses.

**Share of bonds in private placements**



Colorado Bankers (bought 2015)

Southland National (bought 2014)

Life-insurance industry composite (2013-17)

Last full year before acquisition          2017

Sources: A.M. Best (private placement percentages);  Independent Insurance Analysts (industry composite)

Within four months of the deal's approval in August 2014, Alabama regulators were out of the picture. Mr. Lindberg shifted Southland to North Carolina and began replacing tens of millions of dollars of its bonds with loans to Lindberg companies.

By the end of 2015, $177 million of Southland's expanded portfolio was invested in affiliated entities, filings show—more than half its assets at that point.

Although North Carolina statutes are less direct than Alabama's about affiliated investments, regulators there customarily enforce similar limits. They made a rare exception for Mr. Lindberg, allowing Southland to invest as much as 40% of its assets in Lindberg affiliates rather than the normal 10%, according to regulatory correspondence reviewed by the Journal.

The Lindberg spokesman confirmed that. He declined to say who gave the approval, but said it followed multiple discussions with the state's insurance department.

A spokeswoman for the North Carolina insurance department declined to comment on regulation of the Lindberg insurers under the prior commissioner, citing the federal investigation.

At the time, the commissioner was Democrat Wayne Goodwin, who won the office in 2008 and was up for re-election in 2016.

Mr. Lindberg held a February 2016 fundraiser for Mr. Goodwin at his Durham estate. Between that gathering and later donations, Mr. Lindberg, his employees, business associates and some of their spouses and family members contributed about $125,000 to the commissioner's campaign, or more than 10% of Mr. Goodwin's total, election records show. Mr. Lindberg also created a PAC that purchased ads in support of Mr. Goodwin and gave $425,000 to it, records show.

## Deep Pockets

Greg Lindberg donated millions of dollars to political candidates, PACs and party committees.

**Monthly political donations**



Sources: North Carolina State Board of Elections; Florida Dept. of State; Campaign Finance Institute; Center for Responsive
Politics; state records

Mr. Lindberg supported Mr. Goodwin because "he was a business-minded insurance commissioner," his spokesman said, adding that the insurance department's approval of Mr. Lindberg's investment strategy preceded the donations by about two years.

In a statement, Mr. Goodwin said that "any suggestion that I have ever taken any action in return for contributions is categorically false." He said he didn't recall "being asked to take or direct any action" to benefit Mr. Lindberg and had deferred to staff experts on complex regulatory matters.

Mr. Goodwin, now chairman of the state's Democratic Party, said he has cooperated with the federal investigation and has been told by federal officials he isn't a subject of it.

Mr. Lindberg bought several other insurers in 2015 and 2016, in part using money from Southland. He moved them to North Carolina and began operating the collection as Global Bankers Insurance Group.

At first, Southland in its regulatory filings openly listed the flow of money to its owner's ventures as "affiliated" loans, naming Eli Global companies as the borrowers.

The filings raised concerns in Florida, known for tough insurance regulation. Officials in 2016 took steps to suspend Southland from doing business in the state, finding it was "financially impaired" due to the high level of affiliated investments. Southland voluntarily withdrew from the state.

By putting half of its assets in affiliates, Southland had breached even the lenient agreement with North Carolina. A department examiner took note. She directed Mr. Lindberg in an early 2016 letter to "refrain from investing further in affiliates and to provide a plan outlining how [the insurer] will return to compliance with the 40% agreed upon limit," according to a copy of the letter in the internal Lindberg documents.

Mr. Lindberg found a strategy that would allow him to contend on regulatory filings that his affiliated investments were, in fact, unaffiliated.

As part of the plan, an intermediate entity, a "special purpose vehicle," would borrow from one of the insurers and in turn lend the money to a Lindberg company.



Mr. Lindberg began assembling his insurance empire during the tenure of former North Carolina
Insurance Commissioner Wayne Goodwin.

**PHOTO:** BYRON HOLLAND/NEW BERN SUN JOURNAL/ASSOCIATED PRESS

Mr. Lindberg put a small amount of capital into each SPV and was the financial owner,
while the voting rights were held by an entity controlled by William Wofford, a partner at
an outside law firm, Hutchison PLLC, the internal corporate documents show. Hutchison
was paid $400,000 up front for this service.

Because it lacked voting rights, "Eli Global has absolutely no control" over the SPVs, and
therefore they weren't affiliates, the company said in a 2016 presentation to North
Carolina regulators reviewed by the Journal. One slide in the presentation was headed:
"Replacing Affiliate Loans with SPV."

The law firm provided regulators with legal opinions that the SPVs weren't affiliates.
Some of the firm's lawyers including Mr. Wofford donated to Mr. Goodwin's campaign at
the time of the February 2016 fundraiser at Mr. Lindberg's home, held as regulators were
considering the SPV plan.

Hutchison's Mr. Wofford said he supported other Democratic candidates and causes that
year, and "I feel that my firm and I have acted appropriately in these matters."

The Lindberg spokesman said the SPV structure was "developed in consultation with, and
ultimately with the approval of" the North Carolina insurance department, and was
intended to achieve higher bond ratings for the investments, not avoid affiliate-reporting
rules.

Internal Lindberg documents show how this structure worked. Mr. Lindberg's Colorado
Bankers Life Insurance Co. lent $8.8 million in November 2016 to a new SPV, Macon LLC,

which promised to pay 9.5% annual interest over a decade. Mr. Lindberg used that money to acquire a Massachusetts public-relations firm for his conglomerate, the documents show.

By routing the loan through the SPV, Colorado Bankers could claim the loan wasn't to an affiliated borrower, even though Mr. Lindberg was using the money to expand his empire and one of his companies was the ultimate borrower. (The loan was secured by the assets of the public-relations firm.)

Further muddying the waters, the insurers frequently bought and sold such investments, sometimes holding them for only a few months.

By the end of 2017, the U.S. insurers in total had about $710 million invested in entities in which Mr. Lindberg had a significant economic interest, his spokesman said.

Such related investments accounted for about one-third of the combined assets of his three North Carolina-registered insurers at that point, the spokesman said, not counting their investments in each other or related insurers.



The interior of Mr. Lindberg's yacht, 'Double Down.'

PHOTO: MICHAEL BEZJIAN/GETTY IMAGES FOR FT. LAUDERDALE INTERNATIONAL BOAT SHOW



Another view of 'Double Down.'

**PHOTO:** MICHAEL BEZJIAN/GETTY IMAGES FOR FT. LAUDERDALE INTERNATIONAL BOAT SHOW

U.S. life insurers in total reported investing about 1% of their bond holdings in affiliates in 2017, the latest available data, the Journal analysis showed. Only a handful reported more than 10%.

As his empire grew, so did Mr. Lindberg's stated net worth. It reached $1.7 billion at the end of 2017, his spokesman said. That was up fivefold from the $340 million he claimed four years earlier, according to internal documents.

The entrepreneur began leasing a used Gulfstream V in 2014. Soon after, he purchased the Idaho property and filed plans to build a 20,000-square-foot compound. In 2016 he added a $6.2 million, seven-bedroom oceanfront home in the Florida Keys and later bought a second jet.

At his Durham home, on a rural road about 10 miles from the city's center, Mr. Lindberg had a staff of more than 20 and built an indoor tennis facility for his wife Tisha, from whom he has since become estranged, according to interviews and court filings in legal disputes with his wife. The family took a $1 million yacht vacation, his wife said in one filing.

He also became extremely security conscious. He hired a half dozen guards, installed bulletproof glass at both his home and office, and built a separate security facility at his home along with an underground tunnel leading to a windowless "safe room," according to interviews, court documents, and online photos of the house.

Tisha Lindberg said in a legal affidavit last year that she considered her husband "paranoid. Not only is the home completely enclosed by a 15-foot high wall and a 12-foot high fence, we also had a security system with more than 20 security cameras, trained guard dogs and security cameras within our home which were monitored by a 24-hour, seven-day a week armed security team."

Corporate security is normal for any wealthy executive, the Lindberg spokesman said.

Although the maze of entities makes it difficult to trace insurance money directly to Mr. Lindberg's home purchases, at least one can be linked. Last July, after splitting from his wife, Mr. Lindberg through a shell company paid $5.5 million for a 12,000 square-foot mansion in Raleigh.

The house was bought with the help of a $3.3 million loan from Kite Asset Management Inc., listing an address at Eli Global headquarters. A Lindberg insurer invested $40 million in Kite a few weeks before the home purchase. Delaware filings show Mr. Lindberg was Kite's president.



Through a shell company, Mr. Lindberg paid $5.5 million for this 12,000 square-foot mansion in Raleigh, N.C., last July.

PHOTO: PICTOMETRY

The Lindberg spokesman said the houses in Raleigh, Idaho and Florida were investments; the yacht has charter possibilities; his two aircraft were used primarily for business; and "insurance companies have not been used to fund Mr. Lindberg's lifestyle."

Mr. Lindberg used much of the insurance money to acquire scores of businesses for Eli Global, including a New Mexico wine wholesaler, an Australian software firm, a Canadian debt collector and chains of eye-doctor practices.

Eli Global now has more than 130 companies with 10,000 employees and annual revenue of $3 billion—20 times the revenue five years earlier—Mr. Lindberg says on his personal webpage.

Mr. Lindberg's spokesman said some of the growth was funded with third-party loans.

A new North Carolina commissioner, Mike Causey, a Republican, took office in early 2017, after beating Mr. Goodwin. Mr. Causey is a farmer and former insurance-agency owner. The tone of communications to Mr. Lindberg's insurers grew tougher.

"Concerns have been identified regarding the affiliated debt securities and the special purpose vehicles ("SPVs") that are held by the Companies," a senior state examiner wrote to the finance chief of Mr. Lindberg's insurance group in March 2017.

Some affiliated entities borrowing money appeared insolvent, the official wrote. The examiner also said loans to affiliates "were used to provide subsequent dividends to Mr. Greg Lindberg"—suggesting that insurance money was flowing into his pockets. The letter questioned whether some actions complied with state laws.

The Lindberg spokesman said the insurers provided additional information "to substantiate the financial solvency of these entities."

A few weeks after the combative letter, Mr. Lindberg and his wife each donated $5,000 to Mr. Causey, who returned the money. He said he did so "out of an abundance of caution."

Amid the regulatory matters, Mr. Lindberg retained the former commissioner, Mr. Goodwin, as a consultant and hired two of his former deputies, including the aide who had overseen the Lindberg insurers. Mr. Lindberg's spokesman declined to comment on those moves.



North Carolina's current insurance commissioner, Mike Causey, secretly cooperated with an FBI investigation of Mr. Lindberg.

**PHOTO:** DON CARRINGTON/CAROLINA JOURNAL

Mr. Goodwin said his work for Global Bankers was limited and no different than with his other consulting clients.

Mr. Lindberg continued to expand his empire, buying insurers in Michigan, the Netherlands and Luxembourg, and establishing a reinsurer in Bermuda. He also helped finance a reinsurer in Vermont. The Bermuda and Vermont reinsurers proceeded to loan a total of more than $600 million to Mr. Lindberg's companies.

Mr. Lindberg extracted money from the insurers via a Malta entity he set up to provide investment services to his companies. It received $34 million in fees in 2017, Malta filings show; the Lindberg spokesman said fees have since been sharply reduced.

Beginning in late 2017, Mr. Lindberg's Colorado Bankers began hauling in large sums of new money to be invested: $1.3 billion in sales of annuities, a type of saving product, to retirees and other conservative investors. Much of that was lent to Lindberg-related entities, filings show.

Meanwhile, a multistate group of financial examiners was working with North Carolina regulators as they sought to understand the complex structures. Mr. Lindberg fielded questions at a March 2018 closed-door session at a gathering of the National Association of Insurance Commissioners in Milwaukee. He showed up at the conference with a bodyguard, an attendee said.

Mr. Lindberg ramped up political donations in late 2017, giving to insurance commissioners in other states and $670,000 to national Republican organizations. In

North Carolina, he donated $5.4 million in 2017 and 2018, mostly to Republicans.

After contributing $500,000 to the North Carolina GOP in May 2018, Mr. Lindberg suggested the party donate a portion to Mr. Causey's campaign, said Dallas Woodhouse, the party's executive director. Records show the party donated $250,000 to Mr. Causey in June and July. By this time, Mr. Causey was cooperating with the FBI on its secret probe, according to people familiar with the matter. Republican party officials weren't aware of the investigation.

The party maintains it acted lawfully, because officials didn't accept the $500,000 with the intent of helping Mr. Lindberg evade the state's then-$5,200 individual-contribution limit.

Instead, "based on our discretion," the party decided weeks after receiving the money that it made sense to both accommodate a big donor and help Mr. Causey, Mr. Woodhouse said. No authorities have told the party that its conduct "is under question in this matter," he said.

In an interview, Mr. Causey said he turned over the $250,000 donation to federal officials, at their instruction. "It's part of their investigation," he said.

"The department of insurance is not a target," he said, "and none of the employees including myself are targets." He declined to discuss his role in the federal probe.

The North Carolina insurance department is still trying to answer a key question: Are Mr. Lindberg's businesses good for the money they owe to the insurers? Mr. Lindberg's spokesman said third-party valuations last year showed the borrowers had plenty of assets to cover the loans.

Mr. Lindberg's team has shopped the U.S. insurance units to financial firms eager to expand or get into life insurance, and one is interested—if the affiliated investments can be eliminated, according to Wall Street bankers and other knowledgeable people.

Besides trying to sell parts of his empire, Mr. Lindberg has put the Florida Keys property, the Raleigh mansion, his former Durham home and the nearly finished Idaho property on the market, asking a total of $35.5 million.

The executive recently was spending time in Palm Beach, Fla., on board his yacht, according to people familiar with the matter. The boat had been for sale for $44.5 million

when he purchased it in September through a newly formed LLC.

The yacht's name: "Double Down."

*—Tom McGinty in New York contributed to this article.*

**Write to** Mark Maremont at [mark.maremont@wsj.com](mailto:mark.maremont@wsj.com) and Leslie Scism at [leslie.scism@wsj.com](mailto:leslie.scism@wsj.com)

### Corrections & Amplifications

Greg Lindberg leased one Gulfstream jet and bought a second. An earlier version of this article said he purchased both. (Feb. 28, 2019)

*Appeared in the March 1, 2019, print edition as '.'*

Copyright © 2021 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.